IN RE ESTATE OF MEISTER: WOLF and others, attorneys in fact, Plaintiffs-Appellants, v. MCAULIFFE, ancillary executor, Defendant-Respondent.*

*No. 594 (1974). Argued February 2, 1976.—Decided March 2, 1976.*

(Also reported in 239 N. W. 2d 52.)

---

* Motion for rehearing denied, with costs, on May 4, 1976.

586

For the appellants there were briefs by *Kenneth J. Murray, C. James Riester* and *Schroeder, Gedlen, Riester & Moerke* of Milwaukee, and oral argument by *Mr. Murray*.

For the respondent there was a brief by *G. Hans Moede, III, John H. Lhost,* and *Whyte & Hirschboeck, S. C.,* all of Milwaukee, and oral argument by *Mr. Moede*.

HANLEY, J.  The following issues are presented on this appeal:

1.  Did the trial court err in denying the objector's motion to disallow the accounting at the close of the ancillary executor's prima facie case?

2.  Did the trial court commit prejudicial error in denying the objector's motion to amend its objection to conform to the proof after the close of the trial?

3.  Was it error for the trial court to preclude inquiry as to whether discretion granted in the trust instrument was exercised in accordance with the objector's interpretation of the intent of the testator?

4.  Did the executor fail to exercise due care and diligence in the manner and method used in obtaining a purchaser, such that unjustified loss was occasioned the estate?

5.  Did the executor fail to exercise due care and diligence by a sale at a price that unnecessarily decreased estate assets?

*Motion to dismiss.*

Appellants contend that upon the filing of objections to an accounting the burden of proof is upon the executor to show the correctness and propriety of the items called in question.

In *Fitch v. Huntington* (1905), 125 Wis. 204, 208, 209, 102 N. W. 1066, the court observed that an executor should introduce evidence to show the correctness of account items that have been objected to by estate beneficiaries. The objections in that case were directed to fees incurred during administration. Noting that the applicable statute required the probate court to be satisfied as to the correctness of an account even in cases of no contest, the court stated that the executor has a burden of proof on the account which requires some evidentiary support except for those items which are

entirely within the probate court's knowledge from its custody of records of the estate.

Objector's pleadings had characterized the sale price of the property as one of less than fair market value. Although by a posthearing amendment an additional objection was made concerning the necessity of sale, this amended charge was neither specifically brought forth in the oral motion to dismiss the account nor alleged by implication. The motion was brought after executor McAuliffe opened the hearing with his testimony on why and how the property was sold.

The motion, as reiterated on this appeal, stresses the extent to which McAuliffe relied on the Chemical Bank, both for the mechanics and decision of sale. The propriety of the instant property sale and perhaps its relation to the estate plan, which will be discussed further, is seen by the appellants as effectively challenged by their motion such that it had to be justified in the ancillary executor's opening *"prima facie"* presentation. They assert a failure of this burden and an error by the trial court in not immediately striking down the account. Although conceding that the highest bid was accepted, the appellants complain that no testimony was adduced as to compliance with the intent of the testator or as to the benefit to the trust beneficiaries.

The trial court correctly denied the motion. Initially it should be noted that the latter factors cited by the appellant comprise the basis for their additional theory proposed by a post-trial amendment. Even if appellants had promptly and clearly cited this objection from the start, no error exists. They misconceive the rationale of the *Fitch Case*. When a simple objection is made as to whether a claim was existing, as to the amount, or as to how it was settled, the executor who possesses all the information on the item must testify and produce evidence as to its inclusion in the account. Quite simply,

the executor establishes the history of the account, as was the case here.

Respondent aptly notes in these proceedings that the *"prima facie* case is a procedural device, used to determine the appropriate time to shift the burden of going forward with the evidence." An objection that questions the propriety of an action on an account item in the context of the executor's fiduciary duty requires the objector to assume the burden of proof. This is a matter requiring affirmative proof of the questioned circumstances and conduct of the fiduciary which warrants a surcharge of his account for damages. 4 Bancroft, *Probate Practice* (2d ed. 1950), pp. 156, 157, sec. 1004; 34 C. J. S., *Executors and Administrators,* p. 1088, sec. 895 (b) (1942) ; *In re Sullivan's Estate* (1946), 177 Misc. 570, 30 N. Y. S. 2d 954, 958. The testimony of McAuliffe established the history and nature of the account and it was thereupon objector's burden to show why he should be surcharged.

*Objection amendment.*

When the objectors sought after the hearing to amend their objection by adding an additional theory by which to surcharge the ancillary executor, the court replied that it would deny the request because it had

". . . heard arguments on said objections previously, even though not in the pleadings, and considered the same before writing a decision."

The tenor of objector's line of questions and arguments on evidentiary matters obviously indicated to the court that the objectors were pursuing an additional theory. This theory, which will be more thoroughly discussed *infra,* concerns the propriety of the sale price in relation to income that could be earned by retaining the property. Counsel for the ancillary executor also demonstrated

recognition of this theory by directing attention to matters casting doubt on the assumptions and conclusion used by the objectors in this theory.

Although amendments offered after a hearing may involve unique problems of prejudice that cannot be cured, *First National Bank of Kenosha v. Scalzo* (1975), 70 Wis. 2d 691, 698, 235 N. W. 2d 472, those problems were avoided by the early perception of the alternate theory by the probate judge and adversary counsel. The probate court denied the formal amendment only because it felt the theory to be unproven. Implicit in its statement is the recognition that it would, in fact, allow such amendment and entry of judgment on it if the evidence had been corroborative. Allowance of the formal amendment under the circumstances here need not depend upon the assessment of the evidence as in the statutory enablement for correction of pleadings for proof variances, sec. 263.28, Stats. The additional theory was viewed as applicable and evidence on it was received without appropriate objection. Under the circumstances formal amendment should have been allowed and the efficacy of the additional theory would be a question preserved for review. Since the court recognized the additional theory and considered it we see no prejudice.

*Decedent's intent.*

The objectors complain that the probate court erred in precluding inquiry as to whether the discretion granted in the trust instrument was exercised in accordance with the intent of the testator as also revealed in the instrument. We think that the trial court was correct in its ruling, as a review of the proposed inquiry will reveal. A discussion of the instrument's provisions will also set the stage for analysis of the crucial objection to the account on the basis of a breach of fiduciary duty.

In each of the trusts for the Polish beneficiaries, the testator instructed:

"My trustees may retain in said trust any property, real or personal, or securities received from my executors; shall have full power and authority, in their discretion, to sell or otherwise dispose of any such property or securities; and shall have full authority to invest and keep invested the principal of this trust in such property . . . as they may deem advisable without in any way being limited in such investments, whether of cash originally coming into their hands or resulting from the sale of any trust principal . . . . My trustees shall receive the income derived from this trust and, after deducting any expenses properly chargeable against such income, shall . . . pay over the net amount thereof to [named beneficiary.]"

After establishing all trusts and the charitable bequest, the testator further admonished—

"Fourteenth: . . .
" . . .

"My executors and trustees are further expressly authorized to sell or otherwise dispose of any or all real property . . . , at either public or private sale, at such time, upon such terms, for cash or on credit, and at such prices as they shall deem advisable and proper. . . .
" . . .

"Fifteenth: I hereby nominate. . . .
"I grant to my said trustees and executors, except as may otherwise be limited in this will, power to do everything they may deem advisable, without authorization or approval of any court, even though, but for this power, it would not be authorized or appropriate for trustees and executors under any statutory or other rule of law. I include in this grant, without impairing its plenary nature, the following specific powers:
"1. To continue and carry on my investment in any corporation, partnership or business. . . .
" . . .

"3. To sell any property distributable outright to two or more beneficiaries, if, in their discretion, such property cannot advantageously be distributed, and to pay

over the net sales proceeds to the beneficiaries in lieu of such property.

"  . . .

"The foregoing plenary powers are granted not only to relieve my executors and trustees from seeking judicial instructions but also, to the extent that they deem it prudent, to encourage determinations freely to be made, in favor of current income beneficiaries hereunder. In each instance, the rights of all subsequent beneficiaries shall be subordinate; but no trustee shall be answerable to any subsequent beneficiary for anything done or omitted in favor of a current income beneficiary, and no current income beneficiary may compel any such favorable treatment."

When counsel for the objectors was cross-examining James Clark, an agent for the Chemical Bank, the following colloquy took place:

"Q. Would you say that Anton Meister's intent was to provide as much income to the trust beneficiaries as possible?

"Mr. Moede: I object to the form of the question, and it is completely immaterial to these proceedings.

"Court: Objection sustained. The will speaks for itself.

"Mr. Cassan: If it please the court, this gentleman stated that they made this judgment based upon the contents of the will, and they ordered the sale of this property based on what they thought the intent of the will was. I am trying to get . . .

"Court: They had discretion, didn't they, under the will?

"Mr. Cassan: The discretion just gives them discretion to do certain things. It doesn't give them discretion to be reckless.

"Court: Well, let the objection stand."

On this appeal, the objectors have no quarrel with the observation that the will speaks for itself, but "do strongly challenge the principle, implicit in the court's second premise, that a grant of discretion to the trustees

makes intent of the testator an immaterial factor in the administration of the trust."

Appellant objectors cite the trust provision that encouraged prudent asset determinations in favor of subsequent beneficiaries, and note each trust was drawn such that the corpus was to pass to the other trusts rather than the named beneficiary's relatives if that beneficiary predeceased the settlor. They conclude that the primary purpose of the trust was to assure maximum income to the current income beneficiaries.

Undoubtedly, unless qualification to the contrary is present, a settlor desires his trustee to derive the highest rate of return on the principal. The stated intent of the settlor, that his primary beneficiaries receive the benefit of decisions where the trustee may prudently either increase current income or aid subsequent beneficiaries through a course that will increase the future value of the principal, loses something in the translation when the objectors conclude an intent of "as much income to the trust beneficiaries as possible." A benefit flow to the primary beneficiaries could perhaps be maximized by liquidating all properties, even at a loss, and then paying annuities to the primary beneficiaries and distributing any unreleased payments to the relatives upon the primary beneficiaries' death, which clearly contradicts the instruction that these subsequent beneficiaries receive the principal of the trusts.

None of the parties here would dispute that the trustee is obliged under this will to make the trust productive. Bogert, *Trusts and Trustees*, sec. 611 (2d ed. 1960); Restatement (Second) *Trusts*, sec. 181 (1959). The basis on which the appellants seek a surcharge consists of an allegation that an imprudent sale deprived the estate of adequate value for the property. Such deprivation is characterized as a lack of equivalent present value for lost future income and principal from a later sale, a

harm to both present and future beneficiaries. The permissive instruction encouraging determinations in favor of present beneficiaries may call in question the propriety of the overall estate decision to liquidate all properties, but this question cannot be reached here. A determination on that issue requires evidence of all items in the estate, detailed explanation of the distribution problems involved, and the effect on present income beneficiaries who range in age from the mid-twenties to mid-fifties. This decision of the trustees will be considered only in relation to this particular sale, as discussed in the context of the basis for the surcharge.

When counsel for the objectors sought to examine the employee of the executor Chemical Bank on his interpretation of the intent of the testator, he infringed on the province of the court and additionally misconceived the nature of the preceding testimony. He responded to the objection to the question's form and materiality by proposing that the employee had stated that the sale judgment was based on the contents of the will and on what they thought the intent of the will was. Earlier the witness had stated that he had reviewed the will in recommending the overall decision to liquidate, and the court received an affirmative reply to its interposed inquiry into whether the discretionary provisions of the will were considered in reaching that decision. The thrust of that discussion was centered on the power of the executors and trustees, and was not determinative of the propriety. We are satisfied that the probate court knew that a discretionary power may be reviewed for reckless abuse and considered the proposed line of questioning immaterial to a showing that an abuse had occurred through wasting of assets. The duty involved is one of established law and did not require a strained construction of the will to raise it. In requesting post-

hearing briefs, the probate court posed the issues for counsel and indicated he would entertain argument on the construction of the will to the sale and the existence of loss to the estate.

*Fiduciary breach.*

The objectors challenge the probate court's conclusion that no fiduciary breach occurred in the transaction involved here. They originally characterized the sale procedure as inappropriate to procure a price that would adequately reflect its value. Objectors attack the discretionary rationale for the sale, especially in light of the income producing value of the property.

McAuliffe was a "foreign representative" under sec. 868.03 (1), Stats., an executor granted letters by the state of New York. His performance in the ancillary proceedings is therefore measured by his powers and obligations as an executor.

An executor has a fiduciary duty to the parties interested in the estate, that is, the creditors and beneficiaries of the testator. *McKeigue v. Chicago & N. W. R. Co.* (1907), 130 Wis. 543, 546, 547, 110 N. W. 384; *Estate of Van Epps* (1968), 40 Wis. 2d 139, 146, 147, 161 N. W. 2d 278. In *McKeigue,* the court analogized the executor to a trustee of a trust for those parties' benefit.

In *Estate of Scheibe* (1966), 30 Wis. 2d 116, 140 N. W. 2d 196, these views were reiterated in the context of a challenge by beneficiaries of a residuary trust to the self-interest sale of property by the executor. The court recognized that although the fiduciary obligation of the executor does not transform him into an actual trustee, he is in a position of trust and owes a duty of loyalty. Citation was made to Restatement (Second) *Trusts,* sec. 6 (1959), which states that a distinction between an executor and a trustee must be drawn for certain purposes.

From a review of the record of this matter, it is clear that the distinction was muddled at many stages. McAuliffe testified that a decision had been made by the coexecutors to liquidate the properties. The decision could not be carried out until the will contests ceased in early 1969. He cited the difficulty of allocating the residuary estate to the charity and trusts as a basis for such decision. If allocation only within the residuary trusts was involved, it would clearly be a case where the duties of a trustee were involved. Allocation between the trusts and the other residuary gift was actually involved, which removes the decision to the executor's level, although concern for the future trust obligation undoubtedly existed. The later testimony of Clark, an officer of Chemical Bank, indicated that the discretion of the executors was the operative circumstance. He noted that many of the factors compelling the early decision to liquidate remained unabated at the close of the will contests, and that some of these factors still existed at the time of the accounting hearing two years after the instant sale. Specifically, the estate was mainly composed of numerous diverse real property holdings which were difficult to evaluate. Clark stressed that there were great potential liabilities against the estate and even in 1970 the executors could still not determine what the net estate would be. Litigation in the various will contests obviously consumed a portion of the estate. A claim of $700,000 for legal services to the decedent during his lifetime was pending. Another suit concerning a breach of a marriage settlement contract provision regarding sums for the care of decedent's daughter, seeking $500,000, had not been settled by the date of the Wisconsin accounting. Contract claims threatening certain land holdings in Puerto Rico were also still pending. In addition to a federal inheritance tax of two million dollars, a threatened deficiency assessment of "around a million dollars"

was active in 1970 and apparently remained unresolved. State taxes for the far-flung holdings also had to be considered. The probate court accepted findings of fact that eighty percent of the estate consisted of real estate and that the cash requirements of the estate, when the overall sale decision was made, exceeded two-thirds of the gross estate. Clark noted that periodic review of the progress of liquidation was held. As for the proceeds from the sale of the Wisconsin property:

"This $50,000 was accepted into the estate for the general purposes of the estate settlement, and would ultimately go into the trust, if it represented the net proceeds after all debts and expenses were paid, and we might or might not have had that $50,000 at that time."

The testimony compels the conclusion that the exercise of discretion by the executors here was not as simple as the appellant's argued characterization of a trustee merely confronted with a choice of using liquid assets rather than real estate in the trust.

Regarding that simple choice, the appellants object to the rationalization by the ancillary executor that difficulties of administration and possible inequity could result from the use of real estate as the principal. The power to commingle assets was provided.

Assuming that the trust principal could be composed of either more liquid assets or residuary real estate earning a comparable or slightly higher rate of return, the executors did not clearly abuse their discretion under the will in choosing the former. The first problem with using real estate would involve the need for an accurate valuation acceptable to all parties. One-fifth of the property then would have to be transferred outright to the charitable beneficiary, while the rest would have to be proportioned between four trusts. Inequity would result from the various risks and features that affect future value if specific parcels were discretionarily assigned a

value and then allocated to specific trusts, as was once suggested by the objectors. They also argue that the power to commingle directs that a proportionate interest, one-fourth, could be assigned to each trust for each parcel of real estate. When a trust would thereafter terminate because of death of the named beneficiaries, two obvious alternatives would exist for the trustee who must distribute the principal to the second generation beneficiaries. The proportionate interest in each parcel could be further subdivided and conveyed outright to these Polish citizens. Such a share would have little value in and of itself. Flexibility in handling the asset would be lost. On the other hand, the trustee could perhaps buy out the defunct trust's shares for the benefit of the continuing trusts. Considering the appellants' strained construction of the duty to maximize income, there probably would be an objection to the income drain resulting from this option, either through a sinking fund or repayment of necessary loans. Even if the sale could be accomplished at the end of the first trust, the liquidity problem worsens when the next trust fails. As Clark summarized:

"So, again, in the exercise of discretion, we cross that bridge now rather than later, and recommended that these properties be liquidated."

It is clear that the "problems and difficulties" cited by McAuliffe and Clark are not problems for the trustees, who will receive compensation for their handling of a problem, but are problems for the beneficiaries of inequity on the one hand or inadequate distribution and inflexibility on the other. An option to ease these difficulties was seen and exercised.

In between the polar positions of all real property or all liquid assets, there remains the middle ground of a combination of assets. Assuming that the residuary estate

was determinable, the difficulties of trust corpus distribution, explained above, would be mitigated if a large pool of liquid assets existed in each trust, with proportionate shares being held in selected real estate that earned a high rate of return. The rate of return should not only be better than that obtainable by the liquid assets, but it would also have to offset the reasonable fees that the trustee is entitled to receive for its administration. Thus even though a property is returning income at a rate above that for prudent liquid investments, it would not be a mismanagement of the estate to liquidate the parcel if more profitable holdings existed and the need for liquidity remained unsatisfied.

Objectors have failed to prove their case. Confusion of the applicable fiduciary standard and burden of proof are two reasons. Attempting to divorce this transaction from the estate as a whole is another. A surcharge of the executors may sometimes be properly conducted only where the discretionary act can be put in its proper context, such as the final accounting in the domiciliary state. Objectors have not shown that the liquidity need and its causes had ceased *when this sale occurred.* Although great reliance is placed on Clark's statement that the sale was not for the specific purpose of paying the estate tax, the objectors conveniently ignore his explanation that the general cash requirements continued. Even a breach of a trustee's or executor's duty alone does not entitle a surcharge. The objectors must prove a harm to the estate, either a loss in value or a loss of profit. Restatement (Second) *Trusts,* sec. 205 (1959). A loss of future profit through disposal of the parcel would be a chargeable damage only if the property was not needed for necessary liquidity, either for the whole estate or for the trust, but was sold anyway.

In *Scheibe, supra,* this court noted:

"Here, the testator granted an identical power of sale of 'real estate without special court authority' both to his executors and his trustees. The power of sale without special court authority is a trust power not to be exercised with arbitrary discretion or for the benefit of the executor. By the grant of such power the testator imposed on his executor a special confidence, a discretion coupled with a trust to be exercised solely for the benefit of the *cestuis que* trust." *Id.* at 119.

That language must first be read in the context of the fiduciary duty of loyalty in issue there. Also, the *cestuis que* trust, according to the authority recited in *Scheibe,* are the same creditors and beneficiaries that the executor owes his general obligation to, not just the beneficiaries of the residuary trust. Objectors here have failed to address the proper issues and thus failed in their burden to prove that the discretionary rationale of the executors was inappropriate under the circumstances.

This conclusion follows from reviewing their main effort to demonstrate that the sale was improper as it did not equal the value to the residuary trust of the income from the property. The needs of the estate as a whole were ignored in their argument. The witness Clark clarified that there were general requirements for cash in the estate. Lack of necessity for sale was not shown.

As counsel for the objectors noted, a schedule or priority of liquidation should have been established, with properties showing a high rate of return not to be sold until the liquidity needs could clearly be judged. The burden, however, was on them to show that a particular property was among those estate properties yielding the highest return and that the executor should be surcharged for not withholding it until the liquidity need for it existed in fact or within the realm of discretion. The testimony adduced at trial indicates contrarily that general liquidity requirements did exist at the time of sale. Further, it was not established that this parcel was one

of the highest income properties in the estate. Proof of this matter for surcharge seems adducible and proper only in the domiciliary accounting, not in the ancillary proceedings.

*Exercise of care and due diligence in sale.*

In the original objection, the appellants stressed that the sale price did not reach market value. In their brief on appeal, objectors stress that the ancillary executor did not properly conduct the sale so as to produce a fair price, even if they accepted the highest price generated by their faulty methods. The mechanics of the sale, and some of the evidence regarding the value of the property insofar as it affects the sale, must therefore be reviewed.

A sale by an executor, under a will grant of a power of sale at his discretion without special authorization by a court, will not be set aside unless it appears that the price was clearly inadequate and to the damage of the petitioner. *Estate of Friedman* (1947), 251 Wis. 180, 188, 28 N. W. 2d 261. The burden of competent proof on the inadequacy of price is on the objector. A party who seeks to surcharge the executor for an inadequate sale should produce evidence that "a bidder would or could be produced who would pay more if the sale was set aside." *See Id.* The general rule of law is that an executor may render himself liable to a surcharge by acting negligently in selling the property for a grossly inadequate price. 34 C. J. S., *Executors and Administrators,* sec. 664 (1942). The exercise of ordinary care and good faith protects the estate representative. *See: Shupe v. Jenks* (1928), 195 Wis. 334, 218 N. W. 375. Losses from decisions conforming to those standards are no basis for liability. *See: Rasmussen v. Jensen* (1942), 240 Wis. 242, 248, 3 N. W. 2d 335.

As previously indicated, the ancillary executor circulated a one page flyer describing the property to al-

most two hundred brokers in the New York area and to thirty-two Milwaukee real estate brokers in April, 1970. Objectors lay great stress on the fact that the flyer neither set a price for the property nor constituted a listing contract with any one broker. It is also noted that no minimum "upset price" was set by the executor. In fact, four parties, three from New York, submitted bids which were individually not rejected unless a higher bid existed or was later submitted. Bids ranged from $122,000 to $169,838, which high bid was taken.

The executors had a 1966 appraisal of the property that valued it at $320,000. A 1969 tax assessment valued it at $208,960.

Objectors produced an agent of the Wisconsin Department of Revenue who testified that assessed valuation in the city of Milwaukee equaled 51.09 percent of full value. It is persuasive but certainly not conclusive that the parcel may have a value reaching $400,000. This assessed value, however, could also be reflecting the income-producing aspects of the property in addition to one-half of its assumed intrinsic full value. Objectors' appraisal witness also deplored the use of tax assessments in appraisals. Objectors argue that the assessed value must be accurate or the tax-paying tenant would complain, but the record is absolutely barren of how the tenant (who paid the taxes under the lease) felt as to the taxes.

There is, however, pertinent evidence of the tenant's attitude on the property. When Mr. Fox, an agent of Chemical Bank, inspected the site in early 1970, the tenant television company indicated an interest in purchase. It was the only bidder from Milwaukee. The company communicated that it would be interested only to the extent of a figure not substantially above the principal of the mortgage. The offer was raised to a figure of twenty to thirty thousand dollars plus assumption of the mortgage. This roughly equated with slightly

less than its rental obligation under the lease. In explaining its offer, the tenant stated that it did not find the property large enough for its long-term use and that the other possible use of the building as a warehouse was not "maximal" due to its location. Although the objectors characterize this deprecation as bargaining talk, they concede that it was unlikely that the tenant would remain after its current lease expired. An appraiser for appellants agreed. The finding of another television station to occupy the building appears unlikely. Thus, upon expiration of the lease, the executors would have been faced with the prospect of having a vacant, single purpose building on their hands. Respondent's real estate expert testified that the building would then have negligible value, barring extensive renovation, and that the property would tend to have less value over the future time.

There was testimony that the replacement cost of the building was less than the price for which it was sold. Respondent's expert testified that a new warehouse could have been built at a cost of only $5.90 to $6.50 per square foot at the time of sale, for a total cost of $153,400.

From a cash flow viewpoint the property appeared unattractive. Objectors' certified public accountant testified that a purchaser of the property could experience a substantial negative cash flow for the balance of the lease and mortgage term unless he could shelter the book income to be produced by the property with other losses for income tax purposes.

The failure of the tenant to offer even as much as the amount which it would save on its lease demonstrates that the television company tenant did not believe the property would have any substantial value after its lease had expired. Given the risks of a future dried-up market for this parcel, the price obtained in 1970 has not been shown as wholly inadequate.

We conclude that under all the circumstances the sale price was not such as to warrant a surcharge. The trial court did not abuse its discretion and the order is affirmed.

*By the Court.*—Order affirmed.

BEILFUSS, J., took no part.